```
IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

John Irvin                     :

     Plaintiff                 : Civil No. 3:16-CV-2007

     v.                        : (Judge Richard P. Conaboy)

Nancy A. Berryhill,¹           :
Acting Commissioner of
Social Security                :

     Defendant.                :
```
_____

**Memorandum**

## I.  Background.

We consider here the appeal of Plaintiff John Irvin from an adverse decision of the Social Security Administration ("SSA") or ("Agency") regarding his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff's claims were initially denied at the administrative level on July 11, 2013.  Plaintiff then requested a hearing before an administration law judge ("ALJ") and received one on April 8, 2015 before ALJ Michael F. Colligan.  On May 20, 2015, the ALJ issued a decision denying Plaintiff's applications for benefits

---

¹ Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure which addresses the substitution of parties when a public officer is replaced, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.  Fed. R. Civ. P. 25(d).  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. Section 405(g), which states that "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commission of Social Security or any vacancy in such office."

whereupon Plaintiff requested review by the Appeals Council.  On August 4, 2016, the Appeals Council affirmed the ALJ's decision. Plaintiff has appealed to this Court which enjoys jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

Plaintiff's applications for DIB and SSI are predicated on his allegation that he became disabled on March 6, 2013.  Plaintiff claims that his alleged disability is a result of a left shoulder injury status post arthroscopy, left shoulder DJD, cervical degenerative disc disease, asthma/COPD, Raynaud's disease, urticaria, and bilateral basal arthritis of the thumbs.

## II.  Testimony Before the ALJ.

On April 8, 2015, Plaintiff testified before the ALJ.  He was accompanied by his attorney, Stephen J. Hogg.  Also testifying was a vocational expert ("VE"), Dr. Paul Anderson.  Plaintiff testified that he was 54 years of age on the date of the hearing, that he was right-handed, that he graduated from high school, that he served in the military, and that he had training as a barber and held a license as a barber manager.  (R.at 30).

Plaintiff stated that he had briefly worked at two jobs after his alleged onset date.  He could not recall the identity of the first employer but identified Amazon as the second employer.  The first job had been as a cashier at a truck stop.  The job at Amazon was work in a warehouse.  Plaintiff stated that the work at Amazon was full-time but that he was forced to quit "when my thumbs came

into play." (R.31-21). Before his alleged onset date Plaintiff stated that he had worked as a self-employed barber and as a barber in shops owned by others. Before that, Plaintiff worked for the Pennsylvania Bureau of Worker's Compensation and the Pennsylvania Liquor Control Board as a clerk doing general office work. Even earlier in his career Plaintiff had worked as a van driver transporting indigent persons to medical appointments, school, and work. Plaintiff's work history goes back to the mid 1980's. (R.32-33).

In March of 2013, Plaintiff stopped working as a barber due to pain in his left shoulder. At that time working for one day would so exacerbate his left shoulder pain that he would need to take several days off for the pain to subside. As of the date of his hearing (April 8, 2015) Plaintiff described his shoulder as "better than it was" but stated that he still has pain. The pain is aggravated if he tries to raise his arm to shoulder level. This makes it difficult to work as a barber. He also testified to a problem with his thumbs that began in the summer of 2014. The problem with his thumbs required surgery which was helpful to some degree. However, as of April 8, 2015, he still had difficulty pinching or holding objects and has little power in his grip. (R.33-35). Plaintiff also testified that he has been asthmatic since he was a child and that, while his asthma is always present, it is typically well-controlled by mediation like Combivent and

3

Symbicort.  (R.36).

Upon questioning by his attorney, Plaintiff explained that
since March of 2013 his problems with his thumb function would not
permit him to work as a barber full-time.  These symptoms included
extreme stabbing pain at the base of his thumbs that, once started,
would persist for hours.  Even more problematic was his left
shoulder and this was so even after undergoing shoulder surgery in
2013.  He also began experiencing problems in his right shoulder at
some indeterminate time in 2013, but the right shoulder problem is
not as serious as that in his left shoulder.  He estimated that he
cannot lift more than ten pounds overhead with his left arm and
that his right arm is somewhat stronger.  He stated also that he
has more mobility in his right shoulder than in his left.  (R.37-
41).  Plaintiff then testified to neck problems that he
characterized as a "ratching wrench" or a "popping".  He also
stated that he has a hard time turning his head and that when his
neck "pops" it produces pain that lasts for seconds.  He also
stated that he still drives but finds it impossible to wrap his
thumbs around the wheel.  He holds the bottom of the steering wheel
against his palms and exerts upward pressure as needed to turn the
wheel.  (R.42).

Plaintiff also testified that he suffers from urticaria and

Raynaud's disease.[2]  Both these conditions result in a discoloration of the hands caused by poor circulation.  Wet or cold weather aggravates both conditions.  These conditions are characterized by itching, swelling and hives.  During the winter Plaintiff states that these symptoms are a daily occurrence.  While these conditions have been present since Plaintiff's alleged onset date, the Plaintiff was initially diagnosed with these conditions in 1985 or 1986.  Plaintiff also experiences bilateral numbness in his hands and feet as a result of his urticaria and Raynaud's disease.  These symptoms prevent his participation in activities such as climbing a rope, archery, using a rifle, and bicycling.  His ability to handle things is also compromised because his hands lack sensitivity.  (R.42-45).

    While complaining that he is sometimes short of breath, Plaintiff indicated that he could walk from one half mile to a mile without becoming winded.  He could not, however, provide any estimate of his walking pace.  He also stated that, after walking about one mile, pain in his lower back begins to appear. (R.46-47).

---

[2] The Mayo Clinic website defined Urticaria (also known as chronic hives) as: "...a skin reaction that causes red or white itchy welts.  The welts vary in size and appear and fade repeatedly as the reaction runs its course.  Chronic hives are a condition in which the welts last more than six weeks or recur over months or years.  Chronic hives usually are not life threatening.  But the condition can be very uncomfortable and interfere with sleep and daily activities."  The Mayo Clinic website defines Raynaud's disease as a condition that "causes some areas of the body - - such as your fingers or toes - - to feel numb and cold in response to cold temperatures or stress.  In Raynaud's disease, smaller arteries that supply blood to your skin narrow, limiting blood circulation to affected areas (vasospasm}."

In describing a typical day since his alleged onset of disability in March of 2013, Plaintiff stated: that he gets up and makes coffee and something for breakfast; that he does the laundry as needed but uses only his right hand to complete that task; that his back pain limits his standing and walking; and that after his shoulder surgery in September of 2013, he was "pretty limited" for an unspecified time. He stated further that when he worked in the Amazon warehouse - -at a time after his alleged onset date - -he was putting in ten hour days pushing carts that weighed up to 450 pounds. This became difficult "after a while" due to pain in his neck and back and the problems with his thumbs. Plaintiff stated that he would no longer be capable of doing the work he did at the Amazon work site. (R.48-50).

Also testifying was Dr. Paul Anderson, a VE. Dr. Anderson discussed the classifications of the jobs that Plaintiff had performed in the past. He described Plaintiff's various work experiences as light and skilled (barber); medium and semi-skilled (van driver); and light and unskilled (cashier). Dr. Anderson also responded to a hypothetical question from the ALJ that asked him to assume an individual the same age as the claimant and of the same educational level and work history. He was asked to further assume that the individual would be capable of light work in terms of exertion and would have additional restrictions in that he would require an air-conditioned work environment and one in which there

would be no exposure to temperature extremes or dust and fumes beyond what would be expected in a well-maintained home or office setting. Additional limitations would include: no reaching above shoulder level with the left arm; and no climbing involving ladders, ropes, or scaffolds. (R.50).

After outlining the above-described hypothetical question, the ALJ asked the VE whether jobs existed in the national economy within the capacities stated in the hypothetical question. The VE then stated that the hypothetical individual would be capable of performing as a cashier, an information clerk, or an usher. The VE added that the classifications he specified for the various jobs that he mentioned were consistent with publications of the United States Department of Labor (R.51-52).

The Plaintiff's counsel then asked the VE whether his opinion of the hypothetical individual's ability to do the various jobs he had identified would change if that hypothetical individual was incapable of fingering, feeling, and handling more than occasionally. The VE responded that, given these additional limitations, all the jobs he had identified would be precluded. (R.53).

**III. Relevant Medical Evidence.**

**A.    Dr. Keith Cordischi.**

Dr. Cordischi treated Plaintiff at the Lebanon Veteran's Hospital. In May of 2013, Dr. Cordischi saw Plaintiff for an

7

evaluation of his left shoulder.  He indicated that an MRI of
Plaintiff's left shoulder revealed a large spinoglenoid cyst,
suprascapular nerve lesion, and loose bodies in the shoulder joint.
Dr. Cordischi noted also that Plaintiff denied numbness or tingling
but that he had pain with overhead reaching maneuvers and could not
maintain the left shoulder in a static position, such as for
cutting hair.  (R.370-71).  Dr. Cordischi noted that Plaintiff was
a candidate for arthoscopic surgery of the left shoulder to
alleviate the aforementioned conditions.  (R.371).

The arthroscopic procedure was performed in September of 2013
and Plaintiff experienced significant benefit from it.  On October
30, 2013, Dr. Cordischi assessed that Plaintiff was doing very well
and had minimal pain referable to his left shoulder.  Dr. Cordischi
stated: "The patient is doing amazingly well given the extent of
his injury and surgery."  (R.575).  In January of 2014, Dr.
Cordischi saw Plaintiff for a scheduled follow-up visit.  The
progress notes of that visit indicate that Plaintiff continued to
progress and was "in very bright spirits and is very motivated."
(R.572).  In April of 2014, Dr. Cordishci saw Plaintiff once again
and authored progress notes indicating: "The patient has done an
outstanding job rehabbing left shoulder and I emphasize to him the
importance of keeping up with his left shoulder home rotator
cuff/periscapular exercise program.  I provided him with a note
today allowing him to return to full unrestricted duties at

work.... We agree that I will see him back on a p.r.n. basis in the future, and that we have both been quite pleased with the results of his surgery, given the extent of his shoulder pathology." (R.552).

On July 6, 2014, the Plaintiff called the VA to report that he felt like he re-injured the bicep that Dr. Cordischi had repaired. This happened while he was exercising and felt a sudden "pop" and experienced some slight pain. (R.540). This incident prompted a return to Dr. Cordischi on July 28, 2014 incident to which Dr. Cordischi assessed left shoulder pain and a possible biceps tendon rupture. (R>537). Dr. Cordischi ordered an MRI of Plaintiff's left shoulder which was performed on August 11, 2014. That MRI demonstrated: (1) post operative changes in the left shoulder; (2) tear of the supraspinatus tendon with probable vertical split tear of the long head of the biceps tendon anchor; and (3) a ganglion cyst in the subacromial region. (R.517).

**B.   Dr. Daniel P. Healy, M.D.**

On August 8, 2014, Plaintiff saw Dr. Healy with complaints of pain in both thumbs. The pain was concentrated at the base of the thumbs. Dr. Healy's notes indicate that this bilateral thumb pain affected Plaintiff's "power pinch" and general ability to grip objects. Dr. Healy read x-rays of Plaintiff's thumbs that he interpreted to indicate basal joint arthritis involving both the basal and scaphotrapezial joints in both thumbs. Dr. Healy's notes

9

reflect his plan to perform resection surgery at the basal joint of both Plaintiff's thumbs. (R.583).

Dr. Healy performed a right thumb basal joint arthroplasty on Plaintiff on September 2, 2014. (R.585). On October 15, 2014, Dr. Healy observed that Plaintiff still lacked full mobility in his right thumb and that he was experiencing minimal tenderness on palpation. He stated that he would re-examine Plaintiff in six weeks and that if he had progressed well he would schedule surgery on Plaintiff's left thumb. (R.612).

Dr. Healy did perform a left thumb basal joint arthroplasty on Plaintiff on November 25, 2014. A follow-up examination of December 3, 2014 revealed that Plaintiff was doing "well" with no sign of infection and Dr. Healy's progress note of that examination indicates that Plaintiff was cautioned against overuse of the left hand and advised that gradual return of function would take six to eight weeks. (R.610-11). Dr. Healy saw Plaintiff again on January 7, 2015 and observed at that time that there had been a steady improvement in Plaintiff's symptoms in both thumbs and that the right thumb had improved significantly. The left thumb, which had been operated on more recently, still showed "persistent swelling, pain, and limited mobility". Dr. Healy opined that both thumbs were improved following surgery. (R.609). On February 13, 2015, Dr. Healy saw Plaintiff again and noted that he was "gaining mobility and confidence." Dr. Healy also noted that Plaintiff

exhibited pain-free motion with improved grip strength and power pinch, but that he still exhibited some weakness. Dr. Healy's plan called for Plaintiff to progress to full activity through strengthening and motion exercises. (R.713). Dr. Healy's last progress note was recorded some seven months after his first session with the Plaintiff.

### C. Harshadkumar Patel, M.D.

On June 25, 2013, Dr. Patel reviewed all medical documents compiled to that time concerning Plaintiff preparatory to executing a disability evaluation for the Agency. Dr. Patel did not physically examine the patient and there is no indication in the record that he ever saw him. Based upon his review of the medical notes and diagnostic testing that had been performed by Plaintiff's medical providers, Dr. Patel found that Plaintiff's various problems with his left shoulder constituted a severe impairment and that his COPD was "mild" and, consequently, rated it as a non-severe impairment. (R.63). Dr. Patel did not address Plaintiff's basal thumb arthritis because the records documenting that condition were not available to him.

Dr. Patel's assessment of Plaintiff's residual functional capacity included certain limitations. He found that Plaintiff: could only occasionally lift up to 20 pounds; could frequently lift up to ten pounds; could stand and walk for six hours in and eight-hour day; could only occasionally climb ropes or ladders; had

11

limited ability to lift overhead with his left hand; and should avoid exposure to machinery or heights. (R.64-65).

## IV.  **ALJ Decision.**

The ALJ's decision (Doc. 11-2) includes the following Findings of Fact and Conclusions of Law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2.  The claimant has not engaged in substantial gainful activity since March 6, 2013, the alleged onset date.

3.  The claimant has the following severe impairments: left shoulder injury s/p arthroscopy; left shoulder DJD; cervical degenerative disc disease; and asthma/COPD.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(b), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he: will have to work in an air-conditioned environment so that he would not have to be exposed to temperature extremes or dust, fumes, or odors beyond that found in a well-maintained home or office

setting; cannot reach above the shoulder level with the
left arm; and cannot climb ladders, ropes, or scaffolds.

6.  The claimant is capable of performing past relevant work
    as a Cashier II as it is generally performed in the
    economy.  This work does not require the performance of
    work-related activities precluded by the claimant's
    residual functional capacity.  (20 CFR 404.1565 and
    416.965).

7.  The claimant has not been under a disability, as defined
    in the Social Security Act, from March 6, 2013, through
    the date of this decision.

**V.  Disability Determination Process.**

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[3]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a

---

[3] "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

13

substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff is able to perform his past relevant work as a cashier.  (R.at 17).

**VI. Standard of Review**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence

means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise. A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence. Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion. *See Cotter*, 642 F.2d at 706
> ("Substantial evidence" can only be
> considered as supporting evidence in
> relationship to all the other evidence in the

record.") (footnote omitted).  The search for

substantial evidence is thus a qualitative

exercise without which our review of social

security disability cases ceases to be merely

deferential and becomes instead a sham.

710 F.2d at 114.

     This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are
rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.
1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative
evidence has been rejected is required so that a reviewing court
can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement

that the ALJ discuss in its opinion every tidbit of evidence
included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004). "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
. the *Cotter* doctrine is not implicated." *Hernandez v.
Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir.
2004) (not precedential).

A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions. *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . ."). "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,
in making his findings, applied the correct legal standards to the
facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d
Cir. 1983) (internal quotation omitted). Where the ALJ's decision
is explained in sufficient detail to allow meaningful judicial
review and the decision is supported by substantial evidence, a
claimed error may be deemed harmless. *See*, *e.g.*, *Albury v.
Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir.
2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d

17

112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

## A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's

18

disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.  Plaintiff's Allegation of Error.**

Plaintiff's counsel asserts that the ALJ made four errors that, individually or collectively, require a reversal or remand of the Agency's decision.  We shall consider these in the order they were presented.

**1.  Whether the ALJ Erred in Failing to Give Controlling Weight to the Opinion of Plaintiff's Treating Physicians?**

Plaintiff's counsel correctly asserts that the "treating physician rule" (20 CFR § 404.1527) requires that an ALJ accord controlling weight to the medical opinion of a treating source if that opinion is well-supported by the medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record.  While Plaintiff has correctly stated the rule, it unfortunately does not apply to the evidence of record in this case.

The only "opinion" Plaintiff cites is an excerpt from a progress note authored by Dr. Keith Cordischi on May 22, 2013. (R.372).  The relevant language states: "Given the extent of his suprascapular nerve injury and the fact that he can no longer function as a barber, and the fact that we are planning to go forth with surgery, I told him that certainly I could fill out disability paperwork for him and the patient will work on getting back to me

19

before the surgery." This excerpt addresses only Plaintiff's shoulder injury and refers only to his ability to function as a barber. Because the operative standard for a claimant Plaintiff's age to receive DIB or SSI is the inability to perform any work that exists in the national economy, Dr. Cordischi's willingness to fill out "disability paperwork" in that context hardly qualifies as a medical opinion of total disability that would last one year as required by Social Security regulations.[4] Rather, Dr. Cordischi's comment can most charitably be seen only as an opinion that Plaintiff would likely be incapable of working as a barber. Even if we accept that to be a statement of fact, disability for purposes of DIB or SSI would not be established here. Accordingly, Plaintiff's assignment of error on this point must be rejected.

**2. Whether the ALJ Failed to Consider the Combined Effect of all of Plaintiff's Impairments?**

Plaintiff correctly asserts that, in establishing a claimant's residual functional capacity ("RFC") the ALJ must consider the combined effect of all Plaintiff's impairments, be they severe or non-severe. Burnett v. Commissioner of Social Security Administration, 220 F.3d, 112, 122 (3d. Cir. 2000). Plaintiff then

---

[4] Because the record reveals that Dr. Cordischi is a Veteran's Administration doctor, the disability he refers to is likely the sort of service-connected disability administered by the Veteran's Administration through one of its programs. The concept of disability and the standards for establishing it in the sense used by the Veteran's Administration is markedly different than the standard used in Social Security cases and, for that reason, cannot be dispositive of disability in this case.

contends that the ALJ's RFC determination failed to consider the limiting effects of Plaintiff's urticaria, Raynaud's disease, and bilateral basal joint arthritis in his thumbs. Plaintiff testified that he has difficulty with grasping, fingering, and handling (R.42-45) as a result of these conditions. The ALJ recognized the existence of Plaintiff's urticaria, Raynaurd's disease, and basal thumb arthritis, but did not meaningfully provide for the limiting effects, however slight, these conditions may present in his RFC determination (R.13).

While the ALJ did provide that Plaintiff should work only in an environment where he is not exposed to temperature extremes, thus potentially accommodating Plaintiff's urticaria symptoms, none of the other limitations that could be expected to result from Raynauds's disease or basal joint arthritis are addressed in the RFC determination. In light of the VE's testimony (R.53-54) that the inability to finger, feel, and handle on less than an occasional basis would preclude Plaintiff from performing the jobs the ALJ has found to be within his capacities, the Court finds that the record is inadequately developed to properly determine the combined extent of Plaintiff's limitations from his urticaria, Raynaurd's disease and basal joint arthritis. Accordingly, the Court finds for Plaintiff on this point and will remand for further consideration of this issue to include amplification of the record if necessary.

**3.    Whether the ALJ Erred in Finding that Plaintiff Did Not**

   **Meet the Criteria of Listing 1.02?**

Listing 1.02, as applied to Plaintiff's upper extremity limitations, reads as follows:

1.02 Major dysfunction of a joint(s)(due to any cause): Characterized by gross and anatomical deformity(e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:...

b.    Involvement of one major peripheral joint in each upper extremity (i.e. shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively as defined in 1.00B2c.

Plaintiff argues that "[t]he Administrative Law Judge failed to explain why the left shoulder impairment after the recurrence of symptoms in May of 2014 and the bilateral thumb impairments did not meet or equal the listing." (Doc. 18 at 20).

The ALJ's explanation for rejecting the notion that Plaintiff

satisfied Listing 1.02 stated:

> Listing 1.02, relating to major dysfunction of a joint,
> requires gross anatomical deformity and chronic joint
> pain and stiffness with signs of limitation of motion or
> other abnormal motion of the affected joint(s), and
> findings on appropriate medically acceptable imaging of
> joint space narrowing, bony destruction or ankylosis of
> the affected joint.  The Listing also requires
> involvement of one major peripheral joint in each upper
> extremity resulting in an inability to perform fine and
> gross movements effectively.  The alleged impairments do
> not meet this listing because there is no evidence of the
> foregoing in the record.

(R.at 13).

Having considered the ALJ's explanation and having reviewed
the record, the Court concludes that the ALJ's rejection of
Plaintiff's claim that he satisfied Listing 1.02 was appropriate.
The record simply does not support the proposition that Plaintiff
had the requisite profound loss of use or anatomical deformity in
each upper extremity to justify a finding of disability under
Listing 1.02.  Specifically, the medical evidence of the
restrictions in Plaintiff's right shoulder does not establish the
requisite severity of impairment in that joint to satisfy the
Listing.  Similarly, the evidence of the impairment caused by

23

Plaintiff's bilateral thumb problems is not well-quantified in the record and, as such, does not establish the expressed criteria of the Listing.  Certainly Plaintiff's brief does not point the Court to any evidence of that nature.  Accordingly, Plaintiff's argument on this point will be rejected.

   **4.**    **Whether the ALJ Erred in Finding the Plaintiff Not Fully Credible Regarding His Allegations of Pain and Loss of Function?**

   Plaintiff's argument on this point is that the ALJ inappropriately found that his acknowledgments that he had danced at a wedding, continued to drive, and walked several miles each night even after his alleged onset date were reason enough to conclude that all his claimed limitations were overstated. Plaintiff argues that while these admissions tend to cast doubt on the severity of his low back and hip problems, they in no way provide a reason to discount his testimony regarding his hand limitations.  The Court finds that Plaintiff's argument on this point is valid.

   As the Court has noted (Page 20, ante), the record documents hand complaints that could be expected to limit Plaintiff's ability to finger, feel, handle, and grasp.  The Court has also found that the record is not adequately developed to intelligently quantify the limiting effects of Plaintiff's various hand afflictions. Thus, Plaintiff's allegations regarding the limiting effects of his

24

hand symptomology must be credited unless the Agency can point to something in the existing record which this Court has been unable to find that reasonably discredits Plaintiff on this issue.  In the alternative, as suggested earlier, it is likely necessary to expand this record to determine whether all Plaintiff's impairments, along with their cumulative effect, have been adequately accounted for by the ALJ's RFC determination.


BY THE COURT

                                        S/Richard P. Conaboy
                                        Honorable Richard P. Conaboy
                                        United States District Court


Dated: July 6, 2017